# INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS ET AL. v. BROWN

No. 89–1330.   Argued November 27, 1990—Decided February 20, 1991

STEVENS, J., delivered the opinion for a unanimous Court.

*W. Michel Pierson* argued the cause and filed briefs for petitioners.

*Paul Alan Levy* argued the cause for respondent. With him on the brief were *Alan B. Morrison* and *Michael E. Tankersley*.

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Starr, Deputy Solicitor General Shapiro, Allen H. Feldman, Steven J. Mandel,* and *Mark S. Flynn*.*

JUSTICE STEVENS delivered the opinion of the Court.

Labor unions have a statutory duty to distribute campaign literature to their membership in response to the reasonable request of any candidate for union office. In this case the union denied such a request because the candidate wanted

---

*\*Walter Kamiat* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

*Michael J. Goldberg, Clyde W. Summers, Helen Hershkoff, John A. Powell,* and *Susan Goering* filed a brief for the Association for Union Democracy et al. as *amici curiae* urging affirmance.

the literature mailed in advance of the union's nominating convention and a union rule prohibited such preconvention mailing. The question presented is whether a court must evaluate the reasonableness of the union's rule before it decides whether the candidate's request was reasonable. Like the Court of Appeals and the District Court, we conclude that the statute requires us to give a negative answer to that question.

I

The International Organization of Masters, Mates & Pilots (Union) represents about 8,500 members employed in, or in work related to, the maritime industry. Many of the members are away from home for extended periods of time because they work on ships that ply the high seas. Elections of Union officers are conducted every four years by means of a mail ballot. An international ballot committee, which oversees the election, is elected at the convention, and an impartial balloting agency, which conducts the balloting, is also selected by the delegates at the convention. App. 36, 25–26. The ballots are mailed to the membership no later than 30 days[1] after the convention at which candidates are nominated, and must be returned within the ensuing 90-day period. Union rules authorize the mailing of campaign literature at the candidate's expense after nominations have been made but not before.[2] Any Union member in good standing

---

[1] In the 1980 and 1984 Union elections, the ballots were mailed on the 30th day. App. 57.

[2] An affidavit of the international president of the Union describes the procedure:

"The procedure followed under the IOMM&P Constitution for distribution of campaign literature does not permit access to the mailing list for distribution until after nominations have been made. No candidate, including incumbents, may use the mailing list for this purpose before this time. The International Ballot Committee meets after the close of the convention and reviews the qualifications of candidates to ensure their eligibility. Candidates are required to accept nomination within ten days and to certify that they are not prevented from holding office (Article V,

may be a candidate; moreover, a candidate may nominate himself.

Respondent was an unsuccessful candidate for Union office in 1980 and 1984. On May 9, 1988, he formally advised the international secretary-treasurer of the Union that he would be a candidate in the election to be held in the fall and requested that the Union provide him with mailing labels containing the names and addresses of voting Union members to be given to a mailing service so that he could arrange, at his own expense, for a timely mailing of "election literature prior to the Convention." *Id.*, at 41.

On June 2, 1988, respondent wrote to the international president of the Union advising him that he would be a candidate for that office, that he intended to send his first mailing to the membership on July 6, and that he had not "had the courtesy of a reply" to his earlier letter to the secretary-treasurer. *Id.*, at 43. Five days later, the secretary-treasurer provided respondent with the following explanation as to why his request could not be accommodated:

> "Although I can understand your eagerness in wanting to send out your campaign literature early, please be advised that as soon as the rules are established for mailing campaign literature, all candidates will be notified at the same time.
>
> "As the practice has been in the past, and the Constitution prescribes, the IOMM&P Convention is the event in which all candidates officially are nominated to run for a particular office. Only after the Convention takes place, and when the Impartial Balloting Agency is designated, will the mailing agency to handle campaign

---

section 5). Once all candidates are certified, the Impartial Balloting Agency notifies all candidates at the same time of the conditions for distribution of literature. The mailing agency is selected by the Impartial Balloting Agency and is not the same mailing agency used for other communications to members." *Id.*, at 60–61.

literature be designated.   Please refer to Article V, Section 10 of the International Constitution.   This procedure has been established so that each candidate will have a fair and equal amount of time in which to adequately reach the membership and to prohibit any one candidate from having an edge over the other."   *Id.*, at 44–45.

On June 15, respondent appealed that denial to the Union general executive board,[3] repeating his desire for action by July 5.   *Id.*, at 46.   On July 6, the General Executive Board denied his appeal.   Five days later, respondent filed this action under § 401(c) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 532, 29 U. S. C. § 481(c).[4]   In his complaint, respondent alleged that the con-

———

[3] Between conventions, the Union is governed by a general executive board, consisting of the international officers and the vice presidents.   *Id.*, at 18–19.

[4] Section 401(c) of the LMRDA provides:

"Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, *to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization* and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution.   Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the

vention was scheduled to begin on August 22 and that he wanted "to encourage the membership to begin consideration of his candidacy and of the issues he hope[d] to raise during his campaign before the deadline for making nominations, both in order to persuade the membership that he should be nominated and elected, and to attract support from individuals who might otherwise be inclined to run for office themselves or to encourage other members to do so." App. 8–9.[5]

Two weeks later, after both sides had filed affidavits and a hearing had been held, the District Court entered a preliminary injunction directing the Union and its two main officers "within forty-eight hours, and again in response to any future requests" to deliver the names and addresses of the Union members to a mailing service acceptable to the parties. *Id.*, at 74. The order also provided that respondent should pay for the costs of the mailing service. *Id.*, at 74–75. The District Court based its decision on alternative grounds. First, it held that the clear language of § 401(c) required it to focus on the reasonableness of respondent's request rather than on the reasonableness of the Union rule under which the request was denied. In addition, the District Court concluded that the request to make a campaign distribution approximately one month before the convention was "clearly reasonable," and that if the application of a Union rule resulted in the rejection of such a request, the rule was invalid. *Id.*, at 77.

Second, and alternatively, the District Court held that even if the standard of review is the reasonableness of the

---

principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots." 29 U. S. C. § 481(c) (emphasis added).

[5] A few days after the lawsuit was filed, a representative of the Department of Labor wrote letters to both parties expressing the view that the Union's denial of respondent's request violated § 401(c) and was therefore unlawful. See App. 52–54; see also Brief for United States as *Amicus Curiae* 4.

Union rule, rather than the reasonableness of respondent's request, the rule was unreasonable because preconvention campaigning was essential to introducing a candidate and his ideas to Union members and because the postconvention ballot period of 90 days was inadequate for effective campaigning in a Union whose members' work kept them away from home for substantial periods of time. *Id.*, at 77–78.

The United States Court of Appeals for the Fourth Circuit affirmed. *Brown* v. *Lowen*, 857 F. 2d 216 (1988).[6] The majority held that the question whether respondent was entitled to have his request granted depended "entirely on whether his request may be said to be reasonable." *Id.*, at 217. This conclusion involved "nothing more than a reading of the plain language of the statute," *ibid.*, and was buttressed by the statutory purpose of ensuring Union democracy:

> "When the union bureaucracy has exclusive control of the union membership lists, with addresses, as in this case, and that bureaucracy has continuous contact with the union membership and particularly the local union officers, the advantages of incumbency over any attempt of an insurgent to promote his candidacy before or after the quadrennial nominating convention of the union are obvious. By requiring unions to comply with all reasonable requests of candidates for access to the union lists these advantages of incumbency are reasonably moderated. And it was to provide that very moderation of the advantages of incumbency which was the intention of the Act." *Id.*, at 218.

The majority found nothing unreasonable in respondent's request and rejected the Union's argument that it could limit the time in which literature could be distributed in order to

---

[6] The Court of Appeals explained that "[alt]hough the order of the district judge related to an application for a preliminary injunction, the granting of the motion in effect constituted a decision on the merits," and thus, it reviewed the case on the merits, and "affirm[ed] the decision of the district court as one on the merits." 857 F. 2d, at 216.

avoid discrimination, "since any candidate, whether an incumbent or an insurgent, has the same rights as the plaintiff." *Ibid.*

The dissenting judge found nothing unreasonable or discriminatory in the Union's election procedures. According to the dissent, a candidate's request that did not conform to a reasonable union rule was itself *"per se* unreasonable." *Id.,* at 219. After a rehearing en banc,[7] by a vote of 8 to 2, the Court of Appeals adopted the majority's holding and affirmed the District Court. *Brown* v. *Lowen,* 889 F. 2d 58 (1989) *(per curiam).* We granted certiorari, 496 U. S. 935 (1990), to resolve the conflict between the Fourth Circuit's decision in this case and an earlier decision by the Third Circuit in *Donovan* v. *Metropolitan District Council of Carpenters,* 797 F. 2d 140 (1986).

## II

Three important propositions are undisputed. First, even though respondent's campaign literature has been distributed and even though he lost the election by a small margin, the case is not moot. Respondent has run for office before and may well do so again.[8] The likelihood that the Union's rule would again present an obstacle to a preconvention mailing by respondent makes this controversy sufficiently capable of repetition to preserve our jurisdiction. See, *e. g., Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969) ("The problem is therefore 'capable of repetition, yet evading review,' *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, 515 [(1911)]").

---

[7] Although the Secretary of Labor had not participated in any of the earlier stages of this litigation, she filed a brief as *amicus curiae* in support of respondent and participated in oral argument before the en banc panel.

[8] Indeed, because of irregularities in the conduct of the 1988 election, the Secretary of Labor has persuaded the District Court to order a new election. Respondent remains a candidate for the office of international president in that election. However, presumably at this time no question concerning preconvention mailings remains open in connection with the 1988 election.

Second, even though respondent's candidacy had not been certified at a postconvention meeting of the Union impartial ballot committee in accordance with the Union's formal election procedures, it is clear that respondent was a "bona fide candidate for office" within the meaning of the statute when he made his preconvention request to distribute campaign literature. 29 U. S. C. § 481(c). Section 401(e) of the LMRDA guarantees the right of every union member in good standing to be a candidate subject to the "reasonable qualifications uniformly imposed" by the union.[9] The Union, in accordance with our opinions in *Wirtz* v. *Hotel Employees,* 391 U. S. 492 (1968), and *Steelworkers* v. *Usery,* 429 U. S. 305 (1977), does not contend that it would be reasonable to refuse to recognize an eligible candidate until after the nominating process is completed. As we explained in *Wirtz:*

"Congress plainly did not intend that the authorization in § 401(e) of 'reasonable qualifications uniformly imposed' should be given a broad reach. The contrary is implicit in the legislative history of the section and in its wording that 'every member in good standing shall be eligible to be a candidate and to hold office . . . . ' This conclusion is buttressed by other provisions of the Act which stress freedom of members to nominate candidates for office. Unduly restrictive candidacy qualifications can result in the abuses of entrenched leadership that the LMRDA was expressly enacted to curb. The check of democratic elections as a preventive measure is seriously impaired by candidacy qualifications which

_____

[9] Section 401(e) provides in relevant part:

"In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof." 29 U. S. C. § 481(e).

substantially deplete the ranks of those who might run in opposition to incumbents.

"It follows therefore that whether the Local 6 bylaw is a 'reasonable qualification' within the meaning of § 401(e) must be measured in terms of its consistency with the Act's command to unions to conduct 'free and democratic' union elections." 391 U. S., at 499 (footnote omitted).

Third, apart from the fact that respondent's request violated the Union rule against preconvention mailings, there is no basis for contending that the request was not "reasonable" within the meaning of § 401(c). No question is raised about respondent's responsibility for the cost of the mailing or about any administrative problem in complying with his request. The sole issue is whether the Union rule rendered an otherwise reasonable request unreasonable.

## III

The text, structure, and purpose of Title IV of the LMRDA all support the conclusion that our inquiry should focus primarily on the reasonableness of the candidate's request rather than on the reasonableness of the Union's rule curtailing the period in which campaign literature may be mailed.

The language of § 401(c) explicitly instructs the Union and its officers "to comply with *all* reasonable requests of *any candidate* to distribute by mail or otherwise at the candidate's expense campaign literature . . . ." 29 U. S. C. § 481(c) (emphasis added). The language of the statute plainly requires unions to comply with "all reasonable requests," and just as plainly does *not* require union members to comply with "all reasonable rules" when making such requests. Unlike the member's right to run for union office, which is created by § 401(e) and made expressly subject to the "reasonable qualifications uniformly imposed" by the Union, and unlike the member's speech and voting rights, which are governed by sections of the LMRDA such as

§§ 101(a)(1) and 101(a)(2), 29 U. S. C. §§ 411(a)(1) and 411(a)
(2), and are made "subject to reasonable rules" in the union
constitution, the § 401(c) right is unqualified.[10]  Moreover,
unlike other rights created by Title IV that are judicially en-
forceable only in actions brought by the Secretary of Labor,
the § 401(c) right is directly enforceable in an action brought
by the individual union member.  Thus, as the language of
the statute suggests, Congress gave this right pertaining to
campaign literature a special status that it did not confer
upon other rights it granted to union members.

The special purpose of Title IV was to ensure free and
democratic union elections.  See *Wirtz* v. *Glass Bottle Blow-
ers*, 389 U. S. 463, 470 (1968).  The statutory guarantees are
specifically designed to offset the "inherent advantage over
potential rank and file challengers" possessed by incumbent
union leadership.  *Id.*, at 474.  One of the advantages identi-
fied by Archibald Cox in his testimony in support of the Act
is the incumbents' control of "the union newspaper which is
the chief vehicle for communication with the members."[11]  A
broad interpretation of the candidate's right to distribute lit-
erature commenting on the positions advocated in the union
press is consistent with the statute's basic purpose.

The Union advances three related arguments in support of
its position that mailing requests should be considered unrea-
sonable if they do not comply with nondiscriminatory rules

---

[10] " '[W]here Congress includes particular language in one section of a
statute but omits it in another section of the same Act, it is generally pre-
sumed that Congress acts intentionally and purposely in the disparate in-
clusion or exclusion.' "  *Russello* v. *United States*, 464 U. S. 16, 23 (1983)
(quoting *United States* v. *Wong Kim Bo*, 472 F. 2d 720, 722 (CA5 1972));
see *General Motors Corp.* v. *United States*, 496 U. S. 530, 537–538, 541
(1990).

[11] Hearings on S. 505 et al. before the Subcommittee on Labor of the
Senate Committee on Labor and Public Welfare, 86th Cong., 1st Sess., 134
(1959).  Consistent with Archibald Cox's observations, the Union newspa-
per here was also "the principal and only regular source of news which
members have about union affairs."  App. 13.

that have been adopted through democratic procedures. First, the Union correctly notes that any fair election must be conducted in accordance with predetermined rules, and that the reasonableness of any election-related request must be evaluated in view of those rules. Second, it argues that the rule at issue furthers its duty to avoid discrimination in the conduct of the election. Third, it relies on the congressional policy of avoiding unnecessary intervention in the internal affairs of labor unions.

We find these arguments unpersuasive. Rules must, of course, be adopted to govern the process of nominating candidates, casting ballots, and counting votes. Moreover, in connection with the process of distributing campaign literature to the membership, rules that establish the procedures for making mailing requests, selecting a mailing agent, and paying the cost of the mailing are no doubt desirable. The justifications underlying such rules (uniformity of treatment, reduction of administrative burdens) and the fair notice provided to candidates by the existence and publication of such rules all would be relevant in determining whether a request is reasonable. But these concerns in no way dictate a rule prohibiting mailings before a nominating convention. Here, in particular, a preconvention mailing would not place any burden on the Union because the candidate must assume the cost of the mailing. Moreover, in union elections, as in political elections, it is fair to assume that more, rather than less, freedom in the exchange of views will contribute to the democratic process. Here, respondent, by his request for a preconvention mailing, hoped to provide Union members with "more information" with which to inform their voting decisions. App. 14.

The concern about discrimination among individual candidates is surely satisfied by a rule that allows any candidate access to the membership before the convention as well as by a rule that denies all candidates such access. Indeed, arguably opening the channels of communication to all candidates

as soon as possible better serves the interest in leveling the playing field because it offsets the inherent advantage that incumbents and their allies may possess through their control of the union press and the electoral lists during the four years in which they have been in office.

The policy of avoiding unnecessary intervention into internal union affairs is reflected in several provisions of the LMRDA. We have already referred to the fact that the right to hold union office protected by § 401(e) is "subject to . . . reasonable qualifications uniformly imposed." 29 U. S. C. § 481(e). Similarly, the provision in § 101(a)(1) of the LMRDA, 29 U. S. C. § 411(a)(1), governing the right to nominate candidates, to vote in elections, and to attend union meetings is expressly made subject to the union's "reasonable rules and regulations." Moreover, the member's right to speak freely at union meetings is "subject to the organization's established and reasonable rules pertaining to the conduct of meetings." 29 U. S. C. § 411(a)(2). These expressions of respect for internal union rules are notably absent in § 401(c).

Section 401(c) simply prescribes a straightforward test: Is the candidate's distribution request reasonable? Having dispensed with the Union's argument that a request is *per se* unreasonable simply because it conflicts with a union rule, we need only note again that in this case the Union does not advance any other reason for suggesting that respondent's request was unreasonable. The Union does not contend, for example, that respondent's request caused administrative or financial hardship to the Union or that it discriminated against any other candidate. In the absence of any showing by the Union as to the unreasonableness of the request, we hold, consistent with the lower courts' findings, that respondent's request was reasonable and must be granted.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*