**Robert B. REICH, Secretary, United States Department of Labor, Plaintiff–Appellee,**

v.

**LOCAL 396, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, Defendant–Appellant.**

No. 94–55494.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 1995.

Decided Oct. 9, 1996.

Dennis Harley, Pasadena, California, for defendant-appellant.

Mark S. Flynn, United States Department of Labor, Washington, D.C., for plaintiff-appellee.

Before: FLETCHER, CANBY, and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

This appeal arises out of a Labor–Management Reporting and Disclosure Act (LMRDA)[1] Title IV suit brought by the Secretary of Labor against Teamsters' Local 396. The Secretary asserts that Local 396 violated LMRDA § 401(c) anti-discrimination and adequate safeguards provisions by refusing to make available to candidates for union office a list of Local members' job sites. The district court granted the Secretary's motion for summary judgment, and Local 396 appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### The Election

This dispute had its genesis in a November 1992 election of union officers conducted by Teamsters Local 396. Two slates of candidates vied for office: the "Lopez slate," comprised entirely of incumbents, and the "Huff slate," comprised entirely of candidates who had never held union office. This was the first contested election in Local 396's history.

At the time of the campaign, Local 396 had 8,000 members spread among approximately 100 different employers. All of the candidates on the challenging Huff slate worked for the United Parcel Service, which employs about two-thirds of the Local's members. The remaining one-third of the Local are employed by trash collection companies, trucking firms, and small freight companies. The Huff slate did not know what companies employed the non-UPS members or where those members worked.

Because the candidates on the Huff slate did not have personal knowledge of or business contact with union members who did not work for UPS, they repeatedly requested that Local 396's officers provide them with a list of job sites at which Local 396 members worked. Although there is no evidence that a written list of job sites actually existed, it is uncontroverted that union officials, who were also incumbent candidates on the Lopez slate, knew the employers' names and locations of non-UPS job sites either through personal knowledge or through the union's business agents.[2] The union officials refused to provide the challengers with any information regarding the job site of any union member. Although the business agents had knowledge of the information requested by the challengers, the agents were not authorized to disclose job site information except upon the request of union officers.[3]

During the course of the campaign, the Huff slate was limited to appearing almost exclusively at UPS sites. The slate visited only one non-UPS site, a trash collection company that operated in a Huff candidate's neighborhood. Conversely, the Lopez slate campaigned at approximately twelve non-UPS job sites, where at least 875 Local 396 members worked. The incumbents retained six of the seven offices contested by the Huff slate, prevailing by margins ranging from 19 to 674 votes, depending on the office.

### The Proceedings in District Court

After exhausting internal union remedies, Bill Huff, on behalf of his slate, filed a com-

---

1. The LMRDA is codified at 29 U.S.C. §§ 401–531 (1994). Section 401(c) is codified at 29 U.S.C. § 481(c).

2. The incumbents did provide the challengers with a list of all union members and their home addresses, as required by LMRDA § 401(c).

3. "If you're crazy, they have to take you out of combat, but the catch is you have to *ask* them, and if you're trying to get out of combat, then you can't be crazy." Jacob Brackman, Review of Joseph Heller's *Catch 22*, in F. Kiley & W. McDonald, *A Catch 22 Casebook* 363 (1973).

plaint with the Secretary of Labor alleging several violations of the LMRDA. The Secretary investigated the complaint and found probable cause to believe that the Local had violated LMRDA § 401(c) and (e). On May 25, 1993, the Secretary filed suit against Local 396 alleging LMRDA violations. The Secretary requested that the November 1992 election be invalidated and that the Department of Labor (DOL) conduct a supervised election in its place.

The Secretary moved for summary judgment based on the alleged violations. On March 3, 1994, the district court issued an order granting the Secretary's motion for summary judgment as to the § 401(c) claim. The district court did not rule on the § 401(e) allegation, but found that Local 396 had violated two specific provisions of § 401(c), namely that (1) the Local had engaged in "discrimination in favor of or against any candidate with respect to the use of lists of members" (the anti-discrimination provision) and (2) the Local had not provided "[a]dequate safeguards to insure a fair election" (the adequate safeguards provision).[4] The Local filed a timely appeal with this court challenging the district court's summary judgment.

■ The summary judgment order required Local 396 to turn over a list of job sites to the Huff slate, and then conduct a new election under the supervision of the Secretary of Labor. On May 31, 1994, the Secretary conducted a supervised Local 396

officer election. It turned out that the Lopez slate had little to fear from the availability of the job site information; its candidates were elected to all seven of the contested offices. The results of the supervised election were certified by the district court on August 23, 1994.[5]

## II. STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## III. DISCUSSION

We are asked to determine whether Local 396's refusal to provide the Huff slate with a list of Local members' job sites violated either LMRDA § 401(c)'s anti-discrimination provision or its adequate safeguards provision. We hold that the Local's refusal violated the anti-discrimination provision, and accordingly affirm the district court's decision to grant the Secretary's summary judgment motion.[6]

The anti-discrimination provision requires unions to "refrain from discrimination in favor of or against any candidate with respect to the use of lists of members." Local 396 mounts three challenges to the district

4. The Secretary does not unequivocally state that the two provisions provide an independent basis for a § 401(c) violation. The two provisions, however, should not be conflated. We have held that a violation of either the anti-discrimination provision or the adequate safeguards clause constitutes a violation of § 401(c). *See, e.g., Marshall v. Provision House Workers Union, Local 274,* 623 F.2d 1322, 1326 (9th Cir.1980) (anti-discrimination provision); *Marshall v. Local 468, Int'l Bhd. of Teamsters,* 643 F.2d 575, 577 (9th Cir.1980) (adequate safeguards provision).

5. Despite the completion of an intervening supervised election during the pendency of this appeal, the Local's claims are not moot. First, the status of the one Local officer who won in the second election after losing in the first, unsupervised election depends on which of the two elections is valid. Second, the tenure of the winners of both elections would have been shortened by one year

if we had reversed the district court. Finally, the issue presented is capable of repetition yet will evade review. *See Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam) (to satisfy exception for claims capable of repetition yet evading review, party must show that challenged action ceases before it can be litigated and that party may be subject to same action again); *cf. Reich v. Local 30, Int'l Bhd. of Teamsters,* 6 F.3d 978, 984 (3d Cir.1993) (applying *Weinstein* standards and holding that intervening supervised election did not moot LMRDA-based appeal).

6. Because we affirm the district court's summary judgment order on the basis of the anti-discrimination provision, we need not decide whether the Local's refusal to give the Huff slate a list of job sites also violates § 401(c)'s adequate safeguards provision.

court's application of the anti-discrimination provision to the Local's decision not to distribute a job site list. First, the Local contends that the provision is inapplicable because no written list of job sites existed. Second, it argues that a list of job sites is not a "list[ ] of members" for § 401(c) purposes. Finally, the Local asserts that it did not discriminate against the Huff slate with respect to the use of any list. We address each argument in turn.

### A.  Existence of the List

█ Local 396 argues that because no written job site list existed at the time the Huff slate made their requests, there could be no discrimination with respect to the use of a list. The Local's attempt to circumvent the requirements of the anti-discrimination provision through an unduly narrow interpretation of "list" must be rejected. The incumbent slate members had available to them a list of members' job sites; the form that list took, whether tangible or intangible, is of no legal consequence.[7] Indeed, to hold otherwise would allow union officials running for re-election to engage in blatantly discriminatory conduct by exploiting their knowledge of members' job sites while fastidiously avoiding the creation of any written list of those sites.

That the anti-discrimination provision can be applied to an unwritten "list" of jobsites is confirmed by reading the provision in concert with the objectives of Title IV of the LMRDA. *See Wirtz v. Local 153, Glass Bottle Blowers Ass'n,* 389 U.S. 463, 468, 88 S.Ct. 643, 646, 19 L.Ed.2d 705 (1968) ("We have cautioned against a literal reading of congressional labor legislation; such legislation is often the product of conflict and compromise between strongly held and opposed

views, and its proper construction frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve.  The LMRDA is no exception." (internal citation omitted)); *see generally In re Rufener Construction, Inc.,* 53 F.3d 1064, 1067 (9th Cir.1995) ("When we look to the plain meaning of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole.").  The LMRDA was enacted by Congress to remedy "shocking abuses" of power by some union officials. S.Rep. No. 187, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2322. To that end, the anti-discrimination clause was among those LMRDA provisions "specifically designed to offset 'the inherent advantage over potential rank and file challengers' possessed by incumbent union leadership." *International Organization of Masters, Mates, & Pilots v. Brown ("IOMM & P "),* 498 U.S. 466, 476, 111 S.Ct. 880, 887, 112 L.Ed.2d 991 (1991) (quoting *Wirtz,* 389 U.S. at 474, 88 S.Ct. at 649).[8]  Because the LMRDA was meant to mitigate the advantages of incumbency, courts construing Title IV's provisions have been sensitive to the competitive disadvantages challengers face when running against incumbents.  *See Marshall v. Local 468, Int'l Bhd. of Teamsters,* 643 F.2d 575, 577 (9th Cir.1980) (noting that challengers to incumbents must be allowed to make contact with members to have "any hope of success"); *see also IOMM & P,* 498 U.S. at 477–78, 111 S.Ct. at 887–88 ("[O]pening the channels of communication to all candidates as soon as possible better serves the interest in leveling the playing field because

---

**7.**  Nor is the form the list took of any practical consequence in this case.  Local 396 does not contend that generating a written list of job sites would have been difficult or unduly burdensome.

**8.**  Courts are not alone in their recognition that offsetting the advantages of incumbency in union elections was among the most important functions of the LMRDA. *See, e.g.,* George Feldman, "Effective Democracy and Formal Rights," 9 *Hofstra Labor Law Journal* 301, 311 (1992) ("The most important structural barriers to union democracy are based on the inherent advantages in

incumbency in controlling the methods of communication, financing political activity, maintaining stable organization, and establishing the legitimacy of support and the illegitimacy of opposition."); Clyde W. Summers, "Democracy in a One–Party State: Perspectives from Landrum–Griffin," 43 *Maryland L.Rev.* 93, 114 (1984) ("A court's failure to keep in the forefront of their considerations the inherent and overwhelming advantages of incumbents can defeat the purpose of Title IV.").

it offsets the inherent advantage that incumbents and their allies may possess through their control of the union press and the electoral lists during the ... years in which they have been in office."); *Local 3489, Steelworkers v. Usery,* 429 U.S. 305, 310–11, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977) (striking down candidacy requirement under LMRDA § 401(e) in part because it "impair[ed] the general membership's freedom to oust incumbents in favor of new leadership"); *Brown v. Lowen,* 857 F.2d 216, 218 (4th Cir.1988) ("[T]he advantages of incumbency over any attempts of an insurgent to promote his candidacy ... are obvious."); *Donovan v. Local 6, Washington Teachers' Union,* 747 F.2d 711, 716 (D.C.Cir.1984) ("But beyond this general concern with the integrity of the electoral process, Congress sought to 'prevent, discourage, and make unprofitable' improper conduct by entrenched union leadership.") (quoting Senate Report); *United States v. District Council,* 880 F.Supp. 1051, 1071 (S.D.N.Y.1995) ("The incumbents already have ... access [to the membership lists], and providing opposing candidates with similar access seems only fair.").[9] Closely related to reducing advantages of

incumbency that have anticompetitive electoral effects is Title IV's emphasis on facilitating communication between candidates and union members. *See IOMM & P,* 498 U.S. at 477, 111 S.Ct. at 887 (concluding that opening the channels of communication advances Title IV's objectives because "in union elections, as in political elections, it is fair to assume that more, rather than less, freedom in the exchange of views will contribute to the democratic process."); *see also Brock v. Writers Guild,* 762 F.2d 1349, 1353 (9th Cir. 1985) (noting that § 401(c) is comprised of "a set of rights designed to insure that every candidate for union office is afforded equal access to voting members").[10]

It would defeat the objectives of LMRDA to permit incumbents to circumvent the anti-discrimination provision by avoiding the creation of written lists of employers for whom members work when incumbents have made use of the information in their campaigning. The discriminatory conduct engaged in by Local 396 union officials who doubled as candidates on the incumbent slate reflects precisely the sort of ill-gained incumbency ad-

**9.** Congress' concern with incumbency advantage has also influenced courts' analyses of the appropriate scope of LMRDA Title V remedies. *See, e.g., Wirtz,* 389 U.S. at 475, 88 S.Ct. at 650 (rejecting the lower court's remedy for a LMRDA violation in part because the court "fail[ed] to consider the incumbents' possible influence on the new election"); *Marshall v. Local 1010, United Steelworkers of America,* 664 F.2d 144, 149–52 (7th Cir.1981) (holding that the abuse of the union election process by incumbents may justify the refusal of the district court to grant the remedy of a rerun election when the incumbents lost the original election); *Donovan,* 747 F.2d at 716 (same).

**10.** The objective of facilitating nondiscriminatory access to union members is also reflected in other § 401(c) provisions. In addition to the anti-discrimination provision, Congress set out three discrete duties with which labor unions must comply:

1. A labor union must "comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization;"

2. Whenever a labor union or its officers "authorize the distribution by mail or otherwise to members of campaign literature on behalf of

any candidate ... similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution;"

3. A labor union must maintain a list of names and addresses of all union members and allow each bona fide candidate for union office to inspect that list once within thirty days prior to a union election.

29 U.S.C. § 481(c)(1994). Each of these provisions, either by requiring the union to mail campaign literature or by regulating the dissemination of name and address information, insures that unions authorize and facilitate candidates' access to the union electorate in a nondiscriminatory way.

Congress' commitment to facilitating nondiscriminatory access to union members is also part of the LMRDA's remedial framework. In only two instances can individual union members directly bring suit against their union without resorting to the LMRDA's remedial provisions. Both of those exceptions to the general rule of Secretary-led suits are in § 401(c), and both concern candidates' nondiscriminatory access to union members in the period leading up to the election. *See* 29 U.S.C. § 481(c) (permitting direct suits to redress violations of campaign literature distribution requirement and the anti-discrimination provision).

vantage Title IV was meant to combat. Moreover, keeping open reliable channels of communication between candidates and union members was particularly important in this case given that a highly decentralized and mobile workforce comprised the bulk of Local 396's membership.

In sum, if the Local's interpretation of § 401(c) prevailed, the advantages union officials running as incumbents hold over union challengers would be secured using precisely the weapon § 401(c) was designed to blunt: discriminatory access to the union electorate. The letter of the anti-discrimination provision does not require such a result, and the spirit of the provision does not allow it.

### B. Definition of "Lists of Members"

■ The Local argues that even if a list existed within the meaning of § 401(c), the "lists of members" language in the anti-discrimination provision refers only to lists of union members' names and home addresses, and not to a list of the members' job sites. We disagree.

The question whether lists of members can encompass a list of members' job sites was addressed in *Marshall v. Provision House Workers Union, Local 274*, 623 F.2d 1322 (9th Cir.1980). In *Provision House*, we addressed the question of whether candidates had a right to obtain a list of union employ-ers pursuant to § 401(c)'s anti-discrimination provision. We held that no unconditional statutory right to a union employer list exists and no such right could be inferred from § 401(c)'s statutory language or the legislative history of the LMRDA. *See id.* at 1326.[11] We went on to suggest, however, that if there is a showing of actual discrimination with respect to the use of a list of employers,[12] § 401(c)'s anti-discrimination provision would apply. *See id.* (holding that anti-discrimination provision was not violated because "while the union incumbents had access to the office and thus to employer lists, there is no evidence that they made campaign use of the lists").[13] Because we established in *Provision House* that the anti-discrimination provision is broad enough to cover the discriminatory use of a list of union employers, we reject the Local's contention that the "lists of members" clause would preclude requiring a list of members' job sites in a case that warranted the remedy.[14]

### C. Discriminatory Use of the List

■ Finally, we must determine whether Local 396 discriminated against the Huff slate in the use of the list of members' job sites.

In this case, incumbent candidates gained knowledge of Local 396 members' job sites through their activities as union officers and their contact with the Local's business

---

11. These holdings are not disturbed by our decision today. Challengers do not have an unconditional right to job site lists; only if union officials, campaigning as incumbents, use such a list to access union members at their job sites for campaign purposes while denying the list to challengers is the anti-discrimination provision implicated.

12. Whether actual discrimination has been established in this case is discussed below.

13. There is a difference between the lists requested in *Provision House* and the list at issue in this appeal. In *Provision House*, the challengers requested from the union "a list of employers having collective bargaining agreements with the union." *See Provision House*, 623 F.2d at 1324. A list of employers, even if it includes a list of the employers' corporate addresses, may not be identical to a list of job sites at which the union members actually work. Because the difference between a list of employers and a list of job sites is of no legal or practical significance, however, we believe the *Provision House* analysis is applicable.

14. One provision of section 401(c) gives candidates the right "to inspect a list containing the names and last known [home] addresses of all members of" the union. A separate provision of section 401(c) bars "discrimination in favor of or against any candidate with respect to the use of lists of members." Were we to hold that the anti-discrimination clause's reference to "lists of members" encompasses only lists of members' home addresses, that would make the provision superfluous, as challengers already have a substantive right to a list of members' home addresses. In a pure demand for a list, the challengers are only entitled to the names of the members and their last known addresses. If, however, an additional list of members (such as a list of members' worksites) is used by incumbents to gain an advantage in campaigning, the anti-discrimination clause applies in and the challengers are entitled to that list as well.

agents. Having secured this advantage, the incumbents used their position as acting union officials to deny the challengers a job site list and, at the same time, an equal opportunity to reach union members not employed by UPS. The incumbents exploited their advantage by campaigning at non-UPS job sites. *Cf. id.* (holding that union did not violate anti-discrimination provision of § 401(c) in part because "while the union incumbents had access to the office and thus to employer lists, there is no evidence that they made campaign use of the lists"). The incumbents' advantage translated into exclusive, face-to-face campaign access to over eight hundred voting members in an election that was ultimately decided by as few as nineteen votes as to one candidate.[15] Refusing to apply the anti-discrimination provision to these facts would turn the other election-related safeguards included in § 401(c) into meaningless formalities and make a mockery of Congress' commitment to preventing union incumbents from gaining unequal access to union members through discriminatory use of lists of union members.

## IV. CONCLUSION

If eternal vigilance is the price of liberty, then nondiscriminatory use of member information comprises the wages of union democracy. By standing watch over attempts by incumbents to prevent candidates from communicating with the union electorate on an equal basis, Title IV of the LMRDA represents Congress' commitment to assisting union members in their efforts to insure free and fair elections. Cognizant of that commitment, we hold today that Local 396 violated the anti-discrimination provision of LMRDA § 401(c) by campaigning at Local members'

job sites but refusing to turn over to the Huff slate a list of those job sites.

AFFIRMED.

---

**15.** It is difficult to overestimate the importance of face-to-face campaigning in local union elections. *See, e.g.*, Stephen J. Hadley, Timothy S. Hardy, Harold J. Kwalwasser, and Linda L. Tedeschi, "Union Elections and the LMRDA: Thirteen Years of Use and Abuse," 81 *Yale L.J.* 407, 452 (1972) ("In local union elections, the most important campaigning device is face-to-face contact between officer candidates and union members."); Edgar N. James, "Union Democracy and the LMRDA: Autocracy and Insurgency in National Union Elections," 13 *Harvard Civil Rights– Liberties Law Review* 247, 273 (1978) ("Because much of the insurgent's campaign occurs at the work site, information on plant locations is important. Without a list of the membership or a list of the work sites, a candidate spends precious months finding his way around by braille."). The importance of meeting the electorate was heightened in this case because the Huff slate was completely unknown to the non-UPS Local members.