151 F.3d 86
 158 L.R.R.M. (BNA) 2971, 135 Lab.Cas. P 10,212
 Carlos GUZMAN, Rafael Parache, Robert Figueroa, Leon C.
Huguenot, Milton Ayala and Angel Fernandez,
Plaintiffs-Appellees,
v.
LOCAL 32B-32J, SERVICE EMPLOYEES INTERNATIONAL UNION,
AFL-CIO, Defendant-Appellant.
 Dockets 96-9499, 97-7389.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 20, 1997.
Decided Aug. 4, 1998.
 
 Ira A. Sturm, Manning, Raab, Dealy & Sturm, New York City, for Defendant-Appellant.
 Arthur Z. Schwartz, New York City (Lauren Esposito, Kennedy, Schwartz & Cure, New York City, on the brief), for Plaintiffs-Appellees.
 Before: NEWMAN, CALABRESI and CUDAHY,* Circuit Judges.
 CUDAHY, Circuit Judge:
 
 
 1
 Federal labor law regulates the election of union officers. It specifies how often elections must be held and imposes various rules on the distribution of campaign literature, see 29 U.S.C. §§ 481-483, in order to "ensure free and democratic union elections," see International Organization of Masters, Mates & Pilots v. Brown, 498 U.S. 466, 476, 111 S.Ct. 880, 112 L.Ed.2d 991 (1991). If a union pays for the distribution of one candidate's campaign literature, it must also, at the request of "any other bona fide candidate," pay for the distribution of the opposing candidate's campaign literature. See 29 U.S.C. § 481(c). The defendant, a local labor organization, appeals from a judgment requiring it to pay for such a reciprocal distribution. This case raises the questions whether a union publication distributed seven months prior to an election of officers can constitute "campaign literature" when the publication does not explicitly solicit votes, and whether a person can be a "bona fide candidate" before formally announcing or notifying the union of an intention to seek office. We answer both questions in the affirmative. We also hold that a bona fide candidate may request a reciprocal distribution even if the union-sponsored distribution occurred prior to the time he or she became a bona fide candidate. The district court did not err in applying these principles to the facts of this case.
 
 Background
 
 2
 In September 1992, Carlos Guzman, one of the plaintiffs, runs for the presidency of Local 32B-32J, Service Employees International Union, AFL-CIO (the Local), the defendant. He loses. Guzman remains a critic of the Local and its leaders, including Gus Bevona, the Local's president since 1981. Throughout 1994, Guzman distributes literature attacking Bevona's leadership of the Local. On November 15, 1994, El Diario/La Prensa, a Spanish-language daily newspaper distributed in New York City, where Local has its headquarters, reports that Guzman is considering another challenge to Bevona in the September 1995 election. Shortly thereafter, Bevona circulates a memorandum to officials of the Local with a translation of the El Diario/La Prensa article, which renders its headline as follows: "With the Complicity of Their Union, Hispanic Workers Scrapped From Their Posts." The memorandum indicates how to respond to inquiries from members: "In our opinion, the attack is clearly an attempt by dissidents hoping to gain political mileage since they plan to be involved in the upcoming union election." Supp.App. for Pls.-Appellees 2.
 
 
 3
 In February 1995, the Local mails a 142-page book to the membership. The book is called Local 32B-32J, 1934-1994, Sixty Years of Progress. It is a chronological narrative of events in the Local's history, interspersed with brief biographical comments about the Local's six presidents. About half of the text is devoted to the period of Bevona's presidency. The incumbent president figures prominently in the narrative of recent events. Bevona's name appears on 51 of the 59 pages in the second half of the text, usually more than once, and the president is invariably portrayed in a very favorable light. A sample: "While completing preparation for a walkout, the union president brought to bear all the negotiating skills he developed in a 30-year career as a trade union professional." Bevona is among the subjects in at least 49 photographs in this section. The text closes with a 12-page comparison of the Local's "Achievements 'Before' " and " 'During' the Bevona Administration," under the heading, "The Bevona Record: More for Members." Guzman's name is never mentioned, but the publication devotes eight paragraphs to the 1992 election, belittling the opposition candidates led by Guzman for contesting the election and "inconvenienc[ing] the thousands of members who turned out to vote."
 
 
 4
 On April 7, 1995, Guzman mails Bevona a letter informing Bevona that Guzman will indeed be a candidate for president of the Local. On May 30, Guzman writes a letter to Nicholas Caprio, Secretary Treasurer of the Local. This letter asks the Local to distribute a campaign mailing on behalf of Guzman and his slate of candidates for lower union offices. Guzman asserts that Sixty Years of Progress promotes Bevona's candidacy, and claims that federal law requires the Local to pay for a reciprocal distribution on behalf of Guzman and his slate. On June 7, 1995, the Local, through its attorneys, responds that it will not pay for a Guzman distribution. The Local does not agree that Sixty Years of Progress was campaign literature; according to the Local, it "was distributed to members of the Local to give them a fuller understanding of, and more pride in, their Union and its history."
 
 
 5
 The dispute moves to federal court. In August 1995, Guzman and his slate ask a district court to compel the Local to comply with Guzman's request. The district court agrees. The court enters a preliminary injunction on September 6, 1995, requiring the Local to distribute the plaintiffs' mailing at the Local's expense. On September 21, after compliance with the preliminary injunction, the election is held. Guzman loses again.
 
 
 6
 Following the election, the Local appeals the order granting the preliminary injunction. This court concludes that the propriety of the injunction is moot. See 72 F.3d 260, 264 (2d Cir.1995). The case returns to the district court for a bench trial on the merits. The issue becomes whether the plaintiffs are entitled to recoup some additional expenses for preparing and distributing their mailing, or whether they must not only bear those costs, but reimburse the Local for the expense of complying with the preliminary injunction. See id. at 263. On October 21, 1996, the district court finds for the plaintiffs. It awards them $2,588.14 and denies the defendant's counterclaim for $42,209.75. On April 22, 1997, the court awards the plaintiffs $24,761.65 for attorney's fees and expenses.
 
 Discussion
 
 7
 Section 401(c) of the Labor-Management Reporting and Disclosure Act (the Act), 29 U.S.C. §§ 401-531, provides that
 
 
 8
 whenever [a local] labor organization[ ] or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution.
 
 
 9
 Id. § 481(c) (emphasis added). The defendant challenges the district court's factual findings that Sixty Years of Progress was campaign literature and that Guzman was a bona fide candidate for union office when the book was distributed in February 1995. We review factual findings only to correct clear error. See Schermerhorn v. Local 100, Transp. Workers Union, 91 F.3d 316, 322 (2d Cir.1996). The Local's principal arguments are essentially that the district court misunderstood the meanings of the key statutory terms, however, and on those points our review is de novo. See Dexsil Corp. v. Commissioner, 147 F.3d 96 (2d Cir.1998); In re Secured Equipment Trust of Eastern Air Lines, 38 F.3d 86, 89 (2d Cir.1994).
 
 1. Bona fide candidate
 
 10
 The Act does not define the term "bona fide candidate." The district court concluded that the appropriate test is whether the person is actively seeking office. See New Directions v. Seda, 867 F.Supp. 242, 244 (S.D.N.Y.1994); Morrissey v. Curran, 356 F.Supp. 312, 314-15 (S.D.N.Y.1973); cf. Cotter v. Helmer, 692 F.Supp. 313, 317 (S.D.N.Y.1988). The court was satisfied that Guzman met that test by February 1995, prior to his April letter to the Local: Guzman had run for office in 1992, continued to criticize the leadership of the Local during 1994, and at least acknowledged the possibility of running again in the interview published in November 1994. The court also considered it significant that Bevona's November 1994 memorandum "indicat[ed] an understanding on the part of the defendant that Mr. Guzman was a candidate." In that connection, it is instructive that the memorandum's translation of the November 1994 article states that Guzman is "planning once again to run for president of the union next year."
 
 
 11
 The Local does not seriously contest that Guzman was actively seeking nomination: "It is not disputed that prior to announcing his candidacy, Guzman made noises like a candidate." Br. for Def.-Appellant 8. The Local makes its stand on the proposition that a bona fide candidate must have announced an intention to seek nomination. Actually, it might appear from the Local's own translation of the November 1994 article that the Local thought Guzman had announced his candidacy at that time. But in Guzman's trial testimony, Guzman translated the relevant passage as indicating that Guzman was considering running. The district court did not expressly find that Guzman had made an announcement prior to April 7, 1995, and its reasoning is consistent with the absence of such a finding. So we proceed on the basis that Guzman did not formally announce his candidacy before April 7.
 
 
 12
 According to the Local, the Sixth Circuit adopted the Local's criterion for bona fide candidacy in Bliss v. Holmes, 721 F.2d 156, 158 (6th Cir.1983). The issue did not arise in that case, however. The Local also argues that without the bright line rule it proposes, unions will never know for sure when a publication might oblige them to pay for a reciprocal distribution. But a degree of doubt may not be altogether bad. The Local's proposed rule does not rest on any considerations particular to the present case. In any event, we decline to impose such a rule as a matter of law, because at least in some cases it would simply foreclose a remedy for conduct that nevertheless would be illegal under § 401(g) of the Act, 29 U.S.C. § 401(g).
 
 
 13
 The Local's proposed interpretation of the term "bona fide candidate" would limit the reach of § 401(c) to the period between the time the first candidate enters the race and the election. The Local understands that it would still not be free to explicitly endorse a candidate at other times. Section 401(g) provides, in relevant part,
 
 
 14
 No moneys received by any labor organization by way of dues, assessments, or similar levy, and no money of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter.
 
 
 15
 Id. While § 401(c) expressly furnishes a private right of action, only the Secretary of Labor may sue under § 401(g). See Brown, 498 U.S. at 476, 111 S.Ct. 880. For present purposes we assume that, as the Local would concede, a union publication that said "thank you for supporting the union's incumbent officers in last week's election, and we hope you will vote for us again in the next election three years from now" would violate § 401(g). But the Local would like some assurance that until the first hat is tossed into the ring it is free to talk about what a great job its leaders have been doing--as long as it refrains from suggesting that this might have any relevance to a future election.
 
 
 16
 The Local's position seems to assume that § 401(g) only covers express endorsements of candidates or that § 401(g) could not apply to this case if we were to accept the Local's proposed definition of "bona fide candidate." But we have recognized that, at least during an election campaign, § 401(g) is not limited to express endorsements. See Usery v. International Org. of Masters, 538 F.2d 946, 949 (2d Cir.1976). And the term "bona fide candidate" does not appear in § 401(g). So the Local's proposed definition of "bona fide candidate" apparently would not affect whether, under § 401(g), a union would be free to trumpet the past achievements of its leaders up to the moment when the first hat went into the ring.
 
 
 17
 If we thought Usery established that praising incumbents and disrespecting dissidents in a union-funded publication could violate § 401(g) only during an election campaign, and that an election campaign could never be underway before the first candidate's announcement, then the Local's bright-line rule might be attractive. At least it would harmonize §§ 401(c) and 401(g). But Usery does not purport to set the outer limits on the reach of § 401(g). More important, there is good reason to leave open the possibility that a union election campaign could begin before any candidate announced an intention to seek office--a familiar phenomenon in campaigns for public office. Otherwise a union would be free to support an undeclared incumbent until the incumbent announced an intention to seek reelection or were formally challenged, as long as the union refrained from explicitly endorsing the incumbent's candidacy. So although we need not settle the matter now, it appears that § 401(g) could apply to the facts of this case.
 
 
 18
 While it may be true as a practical matter that limiting the threat of liability under § 401(c) would reduce the potential for intervention in unions' internal affairs even when liability under § 401(g) remains a possibility, cf. Calhoon v. Harvey, 379 U.S. 134, 140, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964); Members for a Better Union v. Bevona, 152 F.3d 58, 65 (2d Cir.1998), we see no reason to insulate a union from liability under § 401(c) for activity that might be illegal under § 401(g). The existence of § 401(c) establishes that compelling a union to pay for the distribution of a candidate's campaign literature is not the sort of intrusive remedy that requires mediation by the Secretary of Labor. Cf. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers v. Crowley, 467 U.S. 526, 549-50 & n. 22, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). In our view this conclusion is not affected by the fact that the remedy might be applied based on a communication occurring before any candidates have formally entered the race. As the present case illustrates, the timing and nature of the remedy, which determine in large part its intrusiveness, may bear little relation to the timing of the conduct that triggered the remedy. According to the Local, the intrusiveness of the remedy is also related to the length of the period a union is at risk of doing something that might subject it to the remedy. But if there is support in the case law for that understanding of intrusiveness, the Local has not brought it to our attention. The frequency with which a remedy is actually applied might be related to the length of the period, and frequency might be a relevant factor in gauging intrusiveness. But the Local is a long way from showing that unions in general are likely to be subject to significantly more frequent demands for reciprocal distributions unless its bright-line rule is adopted (let alone showing that the demands would therefore be excessively intrusive).
 
 
 19
 Even if we agreed with the Local on the appropriate construction of the term "bona fide candidate," Guzman's entitlement to a union-funded reciprocal distribution does not turn on whether he was a bona fide candidate at the time Sixty Years of Progress was distributed. It is sufficient that he was a bona fide candidate when he made his request. The language of § 401(c) indicates that a person must be a bona fide candidate at the time he or she requests a reciprocal distribution, but it does not explicitly state that the person must have been a bona fide candidate at the time of the original distribution by the union. For essentially the same reasons discussed in the preceding paragraphs, we see no basis for interpreting the Act as imposing such a requirement. It would leave opposition candidates no recourse under § 401(c) even if a union expressly supported the candidacy of an incumbent officer, as long as no candidate had yet announced an intention to run. This could undermine § 401(c)'s capacity to achieve its purpose of "offset[ing] the 'inherent advantage over potential rank and file challengers' possessed by incumbent union leadership," Brown, 498 U.S. at 476, 111 S.Ct. 880 (quoting Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 474, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968)), by removing a remedy to address what would remain prohibited conduct under § 401(g). Since Guzman declared his candidacy on April 7, 1995, and did not ask for a reciprocal distribution until May 30, this case does not present the question whether a person may request such a distribution before formally entering the race. Accordingly, we need not consider whether a request for a reciprocal distribution could be a declaration of an intention to run for office.
 
 2. Campaign literature
 
 20
 The term "campaign literature" is also not defined by the Act. The district court looked to the "overall timing, tone, content and context" of Sixty Years of Progress. See New Directions, 867 F.Supp. at 245. The court found that the union publication was campaign literature because it "extoll[ed] Bevona's record in glowing terms and characterize[d] the plaintiffs as disruptive and 'frivolous.' " On appeal the Local argues that this finding is wrong, but does not attempt to explain why it is clearly erroneous. An appeal of the judgment following a trial is not an opportunity to retry the case. See Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Whether or not the district court's finding was inevitable, it was plausible. See id. at 573-74, 105 S.Ct. 1504. In Usery we recognized that a union newsletter "laudatory of the incumbent President and derogatory of his opponent" was campaign literature for the purposes of §§ 401(c) and 401(g). 538 F.2d at 949. Perhaps a substantial proportion of Sixty Years of Progress, even most of it, falls outside the scope of § 401(c). See, e.g., Sheldon v. O'Callaghan, 335 F.Supp. 325, 328 (S.D.N.Y.1971) (finding magazine covering "incumbent candidates in their respective representative capacities as active participants in matters of interest to the membership" was not campaign literature). There was, however, enough highly favorable coverage of Bevona to support a finding that the publication was campaign literature. The question whether it crossed the line to violate § 401(c) was therefore within the province of the trial court.
 
 
 21
 A notable difference between this case and Usery is that the union literature at issue in that case was mailed just over a month before the start of an election, see Usery, 538 F.2d at 948, while Sixty Years of Progress was mailed about seven months before the election. According to the Local, the distribution of a publication seven months before an election is just too remote to fall under § 401(c), at least in a case where the publication contains no explicit endorsements or solicitations for votes. The Local offers no evidence that would show why a seven-month period is excessive in this particular case. Instead, it advocates a bright-line rule setting a 60-day window of liability before the election. See Br. for Def.-Appellant 40. The Local points to the 60-day pre-election moratorium applied to Senators' use of the franking privilege for mass mailings. See 39 U.S.C. §§ 3210(a)(6)(A)(i) & 3210(a)(6)(C). A 90-day moratorium applies to Members of the House. See id. § 3210(a)(6)(A)(i). The Local has not addressed why we should follow the Senate rather than the House. In any event, neither chamber's situation is analogous to this case. Congress has apparently determined that in the case of its Members, a 60- or 90-day moratorium strikes the proper balance between the benefits of mass mailings and the potential for abuse, or the appearance of abuse. See S.Rep. No. 97-155, at 5 (1981), reprinted at 1981 U.S.C.C.A.N. 1675, 1678-79. (Congress has presumably also taken into account that Members of Congress faced with a primary challenge could face two non-overlapping moratoria in an election year, a consideration that may not be significant in the case of union elections.) Although outside of the moratorium period, franked mail can include material "laudatory and complimentary of any Member ... on the basis of performance of official duties," 39 U.S.C. § 3210(a)(5)(A), as long as it does not "specifically solicit[ ] political support ... or a vote or financial assistance," id. § 3210(a)(5)(C), during the moratorium the prohibition is virtually unqualified. (Some exceptions come in via the definition of mass mailing. See id. § 3210(a)(6)(E).)
 
 
 22
 The Local does not advocate, and we do not think it would be proper for us to impose, a total ban on a union's communications with its membership for a 60- or 90-day period. Therefore the Secretary or the courts would still have to determine case by case what constitutes campaign literature within some fixed period. So the analogy to the treatment of franked mail does not stand up even on its own terms: the Local wants all the benefits of an open season, but not the costs of a true moratorium. Congress, perhaps because it lacked the direct experience it could draw upon in the case of its franking privilege, chose not to specify a bright-line rule that balanced the benefits and potential abuse of union communications with members prior to an election of officers. We do not view that choice as an invitation for the courts to draw a fixed line; if anything, the choice suggests the undesirability of such a line. Whether the Secretary of Labor is authorized to draw such a line is a question we need not address now.
 
 
 23
 Even if we are wrong about the impropriety of a court-fashioned bright line rule, we would not consider this case to be an appropriate opportunity to fix the maximum length of the pre-election period for all circumstances. The Local has presented no evidence that would permit us to do so on a principled basis. It has not even presented any evidence about the manner in which elections for union officers are conducted or the length of a typical union campaign.
 
 3. Constitutionality of § 401(c)
 
 24
 On appeal, the Local also raises a constitutional point: "That the government wants to encourage democratic processes in internal union affairs is abhorrent to the values of the Constitution"--specifically, First Amendment values. Br. for Def.-Appellant 15. According to the Local, § 401(c) discriminates against union expression by preventing unions from spending money to promote a candidate, "while still giving individual candidates the right to spend their own money to further their positions." Id. At a minimum, the Local contends, § 401(c) is "void for vagueness" in the absence of a bright-line test describing its scope. See, e.g., National Endowment for the Arts v. Finley, --- U.S. ----, ----, 118 S.Ct. 2168, 2179, 141 L.Ed.2d 500 (1998); Gentile v. State Bar, 501 U.S. 1030, 1048-51, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991); Grayned v. City of Rockford, 408 U.S. 104, 108-114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Local thinks a constitutionally satisfactory bright line test would have to limit § 401(c) to a fixed time period before the election and confine its application to statements "specifically addressed to an upcoming election." Br. for Def.-Appellant 38. "[R]eporting of past events, even if reported with a bias in favor of the incumbents," would be fair game. Id.
 
 
 25
 This line of argument was not developed below and is therefore waived. See Carlos v. Santos, 123 F.3d 61, 68 (2d Cir.1997). The defendant insists it did raise the issue below, pointing to a sentence in its memorandum of law in the district court: "In the context of the battle between a Union's exercise of its First Amendment right to freedom of speech and its statutory obligation to treat candidates on an equal footing in terms of campaign communications, guidelines are necessary so that issues are not tried on a case by case basis, with a union knowing only after the fact whether its conduct falls within constitutional free speech or political propaganda." Mem. Law 19. We are not persuaded that this isolated and conclusory statement preserved any constitutional issues. The district court cannot be expected to have evaluated the significance of this comment in the absence of any legal argument or citations to relevant authority. We recognize we may address the issue anyway. See, e.g., Coogan v. Smyers, 134 F.3d 479, 486-87 (2d Cir.1998); Lo Duca v. United States, 93 F.3d 1100, 1104 (2d Cir.1996). But since the Local also has drawn into question the constitutionality of a federal statute without providing the notice required by Rule 44 of the Federal Rules of Appellate Procedure, we think it is prudent to enforce the waiver in this case. Cf. 28 U.S.C. § 2403(a).
 
 Conclusion
 
 26
 For the reasons stated above, we affirm the judgment on the merits. Since the Local's challenge to the award of attorney's fees was premised on obtaining a reversal on the merits (at least in its principal brief to this court), we affirm the judgment in that consolidated matter as well.
 
 
 
 *
 The Honorable Richard D. Cudahy of the United States Court of Appeals for the Seventh Circuit, sitting by designation